The first case for argument this morning is 161913 Autodex North America v. Mitchell International. Mr. Yorks, whenever you're ready. Thank you. I'm Dan Yorks. I'm a patent owner for Autotex. In this case, we have two sets of claims. One set from the 038 patent and another set from the 740 patent. And in the 038 patent, we have recited, amongst other things, calling a database containing vehicle values with an active server page. But let me ask you just about that one little point you said. They all rise and fall together, though, in this case? No. The two patents? No. There's a distinction, for example, on 101. Can we look at the 740 patent or do we have to look at the 038 as well? Is there a difference? We see a distinction between the two. There's a different scope between the amended claims of 740 and 038. The 740 has the additional language about providing estimate data, parts list. Also, the dependent claims, 3740, we cite two different active server pages. One pulls the valuation data and the other pulls estimate data. So we see a different scope and including a different analysis on 101. What about the 038? What's the interesting distinction with that patent's claims? Well, none of these are disclosed as using ASP to actually call databases in a system where you're providing valuation reports. It's a unique novel approach that wasn't done before. To get this particular kind of information. The ASP technology was already established. ASP was a product by Microsoft. Yes. And it had certain functions. One of them was rendering web pages, for instance. Another was calling databases. So you're using that Microsoft technology to go get information that you're saying is novel because nobody had used this established ASP technology to get this kind of information. For this kind of delivery system, that's correct. So that's really the question. Whether the character of your information that you're saying is novel with use with this ASP technology, all of a sudden creates an inventive concept. Well, the claims are directed to... about replacement parts, the cost of certain replacement parts for a vehicle. So it's the character of that information that all of a sudden creates an inventive concept when used with established ASP technology. Is that your argument? Yeah, it is because there's products that provide this kind of information and there are certain systems. And I guess that's my concern with ultimately your case is that I feel like we've had cases here. We've had dozens and dozens of 101 cases. And it's not clear to me why the character of the information of the data that's getting transmitted from node A to node B all of a sudden is enough to be considered an inventive concept when we thematically seem to be more focused on how have you improved a computer or a computer network as a tool rather than using a computer as a tool to send data, collect data, retrieve data, regardless of what that data may be. Well, I think these systems are quite unique. They contain databases with tremendous amounts of data that's very complex algorithms to figure out the data of the vehicle. So it's kind of a niche area. And so the patent is really about creating an improved network, improved system. Right, but you don't claim any complex algorithms to create the databases. You simply say there's pages with data and then we can put them together using this ASP technology, right? Yeah, what I'm trying to describe is that these kind of systems are kind of unique. There's actually only three companies that even provide them really. And so the patent's really about improving the system for delivering this kind of information. That's what it's about. But what is the delivery improvement versus the improvement in terms of the data that we're giving you? So as described in the background, the patent and the prior systems you had, you have an insurance adjuster. He goes online with this product called Pen Pro and there's a lot of graphics and so forth. And you can get an estimate. And then there's something inside the product that will give what is called total loss warning. So your estimate might be close to totaling the car. Then you have to go to a different system and dial in and get this vehicle valuation for totaling, get the total of the car. So it's really inconvenient. So what this technology does is merge those two systems into one interface. And then utilizing ASP to allow for that merger. Okay, so what if in Alice, where they essentially acted this intermediary between the two ends of the transaction, what if they had additional information that informed someone about more aspects of the value of their transaction rather than just where the two come out and matching them up? Would that have changed the result in Alice? I'm not sure I understood the question. You're adding what to Alice? Well, if you added some additional information, some additional data, that would improve what someone would be learning from that intermediary transaction. Yeah, I'm not sure I see the analogy. We're not adding additional data. We're utilizing a software tool, ASP, to come up with a better system for delivering the data. But you're using conventional technology to achieve a result that the district court concluded was just an abstract principle. So I guess I'm having the same difficulty figuring out how your case is different than a large number of other cases that we've gone the other way on under 101. Well, I don't think that ASP used in this way in this kind of system is conventional. It's a product, but I'm not sure really what conventional means, actually. Well, I don't want to get into a debate over what it means, but maybe you look at the word inventive. What's inventive? The fact that you've decided to use ASP in this context? That that, you think, constitutes an inventive concept that satisfies step two? Yeah, you've come up now with a new system that's merged two old systems, and you're utilizing the software tool to get there. And that was never done before in this industry. With respect to your proposed amended claims, the board found both that they would have been obvious and that they added nothing to the 101 inquiry. Now, I understand that there is this issue about where the burden should have been placed. If, in fact, our court were to change the placement of the burden, isn't it true that we could still determine that the placement of the burden in this case might have been harmless if we agree that there's nothing new that the amendments would have added, regardless of who had the burden? Yeah, I mean, I guess you could come to that result in saying it's still obvious. On Section 101, for example, I believe we've said it's a de novo inquiry. And I don't believe anybody here has been arguing there's some difficult underlying factual questions in reaching the 101 question of, what is the abstract idea for your proposed amended claims? And assuming there is, it is focused on directed to an abstract idea of whether there's an inventive concept here. I understand you're saying nobody had used ASP technology before to retrieve this particular kind of data. But in the end, if we were to conclude on a de novo review that this is not an inventive concept, then I want to make clear that it doesn't appear that who has the assignment of the burden of proof on a motion to amend seems to make sense or seems to matter. Yeah, I don't think there are any factual disputes in this particular case. Right. So I would agree with that. By the way, the board never addressed 101 for Claims 3740. Never. It just did the obviousness analysis. Yeah, right. Well, it seemed to, in their section on the motion to amend, I thought they basically said they didn't see anything in the amendments that moved them off of their original view about the original patent claims. Yeah, they cited the independent claim which added the language about estimated data and parts list and then made kind of a general comment like that. But they never did an analysis on 101 for Claims 3740, which they did for the L3A patent. So it just seems like the record is void on their finding of 101 on those specific dependent claims. Right. On those two dependent claims, the board relied on its obviousness analysis. But on the motion to amend, it relied on both. It said it's either obvious or we find it also falls under 101. Yeah, but they never did an analysis on dependent claims 3740. They never said, well, gee, now you have this more unique design where you have one active page getting estimate data, another active page getting evaluation data, and looking at that to see if it is panel subject matter. They never did that analysis. And did you make an argument below as to those modest factors changing an analysis that there is otherwise an abstract idea? Right. Yes, we did. And because it's even more, it gets to a further implementation where you've got the estimate data is typically in a different database than the evaluation data. So now we've got this architecture where we're pulling, with one active server page, the evaluation data, and then another active server page, the estimate data. Could you give me a better explanation of what is it about the fact that your claim is discussing the use of an active server page to go get this data from the different databases, or a separate active server page for each database, why that's an interesting twist? Yeah, because it's, well, let's take, since you look at the primary reference line, it has, I think it's called an appraisal computer, and then it has one database. So that's one way to approach it. The exemplary embodiment we have in the patent, we have actually different, we have an application server and an evaluation server. And keep in mind, again, there's a tremendous amount of data in these things because you've got every single car, every model, every year. So that architecture is more efficient, and so utilizing active server pages, two different ones, to go to the different servers improves the efficiency of the system. Then, as opposed to, say, if you were just looking at a big book that had the evaluation of each car for every make, model, year, having it in a database and then accessing the database through an active server page, that makes everything more efficient, in your view? Well, we were talking about the Claim 37 where we have two different active server pages. One in the document, we have one that goes to the application server and pulls the estimate data. And then we have another active server page that goes to the evaluation server and pulls the valuation data, the value of the car. So it's not one big book because you've got, like, the estimate data for how much to repair your car. That's something, it's a different database, typically. Okay. We're well into rebuttals, so why don't we hear from the other side. I'll save the remainder for you. Good morning, Connors. May it please the Court. May I proceed? Yes. I'm sorry. Can you start where he left off, pretty much? Do you agree that the Board never did a separate analysis with respect to those two dependent claims? I do not. I disagree with that. So, as you pointed out, the Board went through a complete 101 analysis for all the original claims and found why they did not satisfy the 101 threshold. They then looked at the amended claims, including all of them in the 740 patent, including 37 and 40, and concluded that nothing in those amendments added anything to the original claims that pushed them over the hurdle for 101. So if you see that, it's in appendix pages 34 and 35. I guess it goes back as far as 33. The Patent Trial and Appeals Board absolutely addressed all of the proposed substitute claims for the 740 patent and came to the right conclusions on those. So you view the obviousness analysis and inquiry as an alternative finding with respect to the amended claims? Absolutely. The Patent Trial and Appeals Board found both 101 and 103 as separate independent reasons to deny the substitute claims for both the 740 and the 03. And I think both of those, again, would be individual grounds to sustain what the Patent Trial and Appeals Board has done. And I think that there is substantial evidence to support their conclusions for both of those. And if we find that ultimately placement of the burden with respect to a determination of patentability on the patent owner for motions to amend is improper, does that mean that we would need to send this back? No. I think the result here that you can reach is the same regardless of whether or not there was a misapplication of the burden of persuasion. If the in re opera products case changes where the burden of persuasion is applied, then here I think you can still affirm for all the reasons you've said and probably more. I would suggest that the burden of persuasion and the allocation of it before the Patent Trial and Appeals Board did not affect the Patent Trial and Appeals Board's decision. As you've noted, there were factual findings that were supported by the record. And then the legal conclusions based upon those were not founded on the burden of persuasion. They were founded on the facts and the decisions that they came to. As you noted, Judge Chen, eligibility under 101 is a legal question that's reviewed de novo. And you've got all the factual underpinnings that you need here to reach the conclusion that you need to reach on Section 101 without need for remand. And under Section 103, that's a legal conclusion that's based upon underlying factual determinations. And here the Patent Trial and Appeals Board made the factual findings and then reached legal conclusions based on those findings. I would suggest their factual determinations... Or if we ultimately conclude they were wrong in their placement of the burden, that it was essentially harmless error. That's right. And I don't think Auditex has really shown any prejudice resulting from the misapplied burden of persuasion here. And in fact, I would suggest that if the burden of persuasion was misapplied to Auditex below, that gave them every incentive to come forward with the best case they could, make all the arguments they could, and present all the facts they could. And I believe they did that. And based upon everything in the record, the Patent Trial and Appeals Board came out in our favor on 101 and 103. So I don't believe that even if you find a misapplication of the burden of persuasion, that you need to remand for any further considerations. So could you go to the actual content of proposed claims 37 and 40, which the other side leaves that there is an inventive concept there in using one active server page to go get valuation report data from one database, and then a second active server page to go to a second database to go get the cost estimate data for how much it would cost to repair a car? And combining those two things and drawing data from those two databases in that way creates an inventive concept. Can you comment on that? Absolutely. And I think the answer to that is clearly no. That simply using ASP, which you heard Council for Auditex admit was well-known conventional technology that existed in the marketplace. And I believe he also admitted that one of the known uses for ASP was to call a database and obtain information. Can you explain what ASP is and how does it work? Sure. ASP is an acronym for active server pages. And basically, think of it as an embedded script or a piece of code in a web page. I think of, maybe if you think of the old original HTML type web page, if we go way back in time to maybe the mid-90s when the internet was new, and you had static web pages, it's sort of like a book. You open a book and the words don't change on it. But what an active server page did is it allows you to embed some code in the page that would give you access to different information. So when I open a web page, instead of having a static HTML page, which every one of us would see the same page if we opened it, we then may see something different or some different content. And I think this is kind of what folks use if you're familiar with internet browsing, where it's always amazing to me when you open a web page, sometimes ads pop up for things that you've been looking at recently on the internet. I believe that they track information and they use that script in the web page to access a database and pull some information forward that's maybe specific to you. So this is a known and existing technology to access a database and present information to a user. And there was nothing unique about using ASP to retrieve the specific types of data that's involved in this case. I think Your Honor has asked him that question, and I don't believe any arguments were made in their briefs to say there's somehow something unique about the information related to vehicle valuations that requires some special type of ASP active server pages to call it. You didn't hear that argument from him and you don't see it in the briefs. I think the reason is because it is just data. The only argument we heard from Autotext Counsel was that what's unique here is that there's large volumes of data. But just simply having large volumes of data does not make the retrieval of that information unique or somehow unconventional. What about his argument that it uses complicated algorithms to create the data? Well, so I agree with you. I think you made the comment that that's not anywhere in the claims. I mean, there may be some background processing that happens using some algorithm that's maybe, as he called it, complicated, but you do not see that reflected in the claims. Remember, the focus for the 101 inquiry is what's in the claims, not what's in the specification. And I would suggest if you look at the specification, there's not complex algorithms disclosed there either, but certainly not in the claims. So if we focus on what's actually in the claims here, there's absolutely nothing to support this idea that they get over the 101 hurdle because complex algorithms are somehow used in the background. It just simply is not there in the claims, which is what we have to focus on. So I see this as completely a conventional use of conventional technology in a well-known manner that does not include existing technology. And this lines up with many of the cases we've seen on data manipulation. We cited some of them in our brief, the electric power group case, in-rate TLI, Affinity Labs. There's many of them that you have noted that deal with data manipulation, find that that type of claim does not get you over the Section 101 hurdle. Now, there are cases, and I want to touch just on them briefly, such as BASCOM and DDR, where this court has found that certain types of information in a claim can get you over the 101 hurdle. But in those cases, the consistent theme about all of them is that there was non-conventional use of technology in a non-conventional way to get an improvement in the technology itself. And what we have here distinguishes our case from those because it is a use of conventional technology. ASP is conventional. It's used in its conventional form, as I think Autotext Council admitted here today, and does not achieve any improvement of the computer processing itself. So for those reasons, this case is clearly distinguishable from BASCOM, DDR, and the other handful of cases in which you found Section 101. I guess the other side's retort would be, well, they're using this ASP technology to draw from two separate databases using two separate active server pages. And so somehow the combination of all that is the unconventional arrangement of technology. And I would have to disagree with that because, again, we know ASP exists. It was created by Microsoft for the specific purpose of pulling data from a database. And the fact that you're using two different pages to pull data from two different databases is not unique. It's not unconventional. In fact, it is the definition of conventional. So for that reason, we think that they can't pass the 101 hurdle here under either Step 1 or Step 2. I want to transition, if I could, just to the obviousness piece so I can touch on that, because I do think that that's a separate independent ground that would give you basis to affirm the PTAB's decision. Now, the Patent Trial Appeals Board concluded on a limitation-by-limitation basis that the proposed substitute claims were obvious, based on RINAL as the primary reference, and other evidence establishing the prevalence of ASP active server pages generally, and also pre-existing use of ASP in the insurance industry before the patent suit were filed. The board did not rely upon hindsight to find it was obvious to calculate the value of the vehicle just prior to being damaged. Rather, the Patent Trial Appeals Board relied upon RINAL's disclosures that its system obtains pre-damages value. It went through and explained how you can actually use the system in RINAL, which accesses database to return a value of a vehicle. The user has control over the information that's input about the vehicle. So if they want to get the value of a vehicle with damage, you can put damage in. You can say the bumper's been damaged and scratched. If you want a value of a vehicle without the damage, you simply do not put the damage in. Okay, but the argument on the other side is going to be that RINAL at least doesn't expressly disclose reference to pre-damage value. So we have to assume that it sort of flows logically. Yeah, I would disagree with that at least. And this is on appendix page 800 and addressed in our brief at page 48 to 49. The default value, this has got drop-down menus when you go component by component for the car to describe the condition. The default value in every instance for RINAL is no damage. You can actually see it says no damage. So if you put the make, model, year, and other distinguishing information about the vehicle in, and you do not do any adjustments, you are actually going to get a value of that vehicle without any damage to any components. The user has to go in and component by component describe the damage to get the value of the post-damaged vehicle. So I would suggest that RINAL does disclose expressly getting a pre-damage value of the vehicle. And that's what I think both experts testified to and agreed to in this case. Both experts agreed to that? I mean, my understanding of RINAL was really RINAL's whole purpose of what he created, this product, was to try to figure out the estimate of the value of the car after it's been damaged. RINAL doesn't actually say anything about let's try to figure out the value of the car before it got damaged, right? Well, again, there's a lot of different scenarios described in RINAL as to how that thing may be used, how the computer database system could be used by different folks who have different goals in mind. And for certain, our expert, Mr. Keebler, said, when I read everything that's in RINAL, as a person of ordinary skill in the art who's been in this insurance industry, I understand certainly that I could use this tool to determine a pre-damage value of the vehicle that's been in an accident. For example, everything that I've told you right now, if you go through, enter make model year, engine size, and things like that, if you do nothing else, the default value you're going to get back is the value of the vehicle without any damage to any of the components. You have to actually go through and change it. So I think if you just look at that on its face, it tells you that you can get various types of values for a vehicle, including post-accident damage value and a pre-accident damage value. So I would disagree and say that it's only directed to providing vehicle valuations that include damage estimates or calculations. In terms of whether or not there's a motivation to combine, so I think RINAL, the only thing that's missing from RINAL, arguably, is the specific use of ASP active server pages. But the board did go through and address exactly why there is a motivation to combine, and that's found on appendix page 42. They actually explain why there is motivation to combine RINAL with ASP. We also have Autotex's expert, so that's their expert, who said, we asked him the question. We said, quote, so someone would have been motivated to use ASP technology because it was really one of the only available technologies that could dynamically process content from web pages, right? And his answer was right. And add to that that in the corporate environment, Microsoft was very strong. So people were often in the corporate environment hosting on Microsoft servers with IIS. So you've got Autotex's expert saying, yes, ASP was a well-known technology. If you were going to look to a way to use that technology to access databases, ASP is where you would have looked. And that's on appendix page 1372 and appendix page 3279. It's also noted in our brief on pages 52 to 53. And also on page 53 of our brief, we've got statements, obviously, from our expert, Mr. Keebler, who agrees explaining why ASP was well-known and would have been used in the industry. So when you consider all of that, the only thing that's arguably missing from RINAL is ASP. Everything else the Patent and Trial and Appeals Board found was in there. It's obvious to use ASP. And there's two other references that have shown that combination was obvious. And therefore, it's additional reasons why you could affirm the Patent and Trial and Appeals Board decision on the 101 reference. Unless you have any questions, I will sit down. Thank you. I want to address the 103 issue. There were two references used by the board that supposedly showed ASP used in insurance systems. One was the Business Wire article that discusses Mitchell's products. And ASP there, it's only mentioned in the title. There's not any description about how it's used or if it had been just used to render web pages like standard. But it was clear it was used in the insurance industry and it was known in the insurance industry from those references. Well, it's not clear. It just says, you know, ASP in the title. There's no discussion in the article at all how it's used. I mean how it's used. Yeah, how it's used. It was a discussion that it was being used in the industry. And that's the only factual finding that the board made was that it was used and known in the industry. Right. But our claims are specific to using one aspect of ASP, which is to call databases. As I mentioned earlier, you can use it for rendering web pages too. In fact, Dr. Westland surmised that's probably how ASP was using it. They didn't come up with any evidence that they were using it to call databases. And what evidence did you present to show that your use of ASP was substantively different from any other previously known use of ASP? Well, again, the claims, for instance, in 3740, it's combining these two systems for estimates and valuations. And I'm going to use this software tool called ASP. And that was never done before. In fact, in the Mitchell article, they note they have an estimate system and they have a valuation system. This is on 3821, the very last paragraph. So they actually had two different systems. I don't know what they were using ASP for. But there's an example of what the industry was doing back then. They had an estimate system and they had a valuation system. And this claim to mention is the first in the industry to combine those two for one portal or one point of access for the user. And why wouldn't that have been obvious? Just curious. Even though it may have been novel, why wouldn't it have been obvious to just combine the sources of data you get from Pen Pro and AutoSource? And then call up the data in one shot. They're complex systems because, for instance, the insurance companies who are primarily the customers, they all have their own requirements. And, for instance, counsel is noting that the HTML, you get the same screen, but State Farm is going to have a different screen, they have different rules, they have different requirements than Allstate. So it's not just putting the two together. You had to come up with something that would allow for these different requirements for the different customers. Can you point me to an explicit claim limitation that you're saying the board didn't consider and that you think differentiates your system from any prior use of ASP? Well, I'm going to stick with claims 3740. But what in claim 3740? So give me a claim limitation that you think screams out. I'll give you two of them. One is you've got a valuation system that's also giving you estimate data. That's not in the IRB. And then also claims 3740, the IRB doesn't show two different active server pages, one getting estimate data, the other getting valuation data. So those are the particular limitations. Okay. You didn't present any evidence of objective indicia below, did you? We did. Some. You did? Yes. And you're just saying the board just never addressed it? Correct. Okay. Thank you. We thank both sides.